**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**



PRIME TABLE GAMES LLC, a Nevada
limited liability company, DEREK WEBB,
HANNAH O'DONNELL and PRIME
TABLE GAMES UK, a United Kingdom
partnership

                          Plaintiffs,

v.

SHUFFLE MASTER CORPORATION, a
Minnesota corporation,

                          Defendant.

Case No. 3.08cv 534 HTW LRA

**JURY TRIAL DEMANDED**

## Complaint for Damages, Injunctive and Declaratory Relief for Patent Infringement, Violation of the Sherman and Clayton Antitrust Acts, Unfair Competition and Deceptive Practices under the Lanham Act, Breach of Contract, and for Other Equitable and Legal Relief

Plaintiffs Prime Table Games LLC ("Prime"), Derek Webb ("Webb"), Hannah

O'Donnell ("O'Donnell") and Prime Table Games UK ("UK") (collectively "Plaintiffs")

allege the following for their complaint against Defendant Shuffle Master, Inc. ("Shuffle

Master" or "Defendant").

### I. NATURE OF THE CASE

1.     This is a civil action for damages, injunctive and declaratory relief based on multiple

violations of the antitrust laws, including Sections 1 and 2 of the Sherman Act and Section 7 of

the Clayton Act, patent infringement, unfair and deceptive trade practices, and breach of

contract; and for relief from the enforcement of contractual provisions which, in combination

1357850

with the other anticompetitive conduct set forth herein constitute an unreasonable restraint of trade and attempt to monopolize the relevant markets in violation of Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1 and 2)

## II. JURISDICTION AND VENUE

2.      This is an action arising under the antitrust and patent laws of the United States, particularly Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1 and 2), Section 7 of the Clayton Act (15 U.S.C., § 18), Sections 283 and 284 of the Patent Code (35 U.S.C. §§ 283 and 284), the Declaratory Judgment Act (28 U.S.C. § 2201), Section 43(a) of the Lanham Act (15 U.S.C. § 1125(a)(1)(b)) and the common law of the state of Mississippi.  This Court has jurisdiction over the subject matter of this action pursuant to 15 U.S.C. §§ 4, 15, 25, 26 and 1121; 28 U.S.C. §§ 1331, 1337 and 1338 and the Court's supplemental jurisdiction under 28 U.S.C. §1367.

3.      Personal jurisdiction and Venue are proper under 15 U.S.C. § 22 and 28 U.S.C. §§ 1391(b) and (c).  Defendant is a corporation which resides in this Judicial District, may be found in this District, has a registered agent and branch office (in Gulfport) in this District, has transacted substantial business in this District, and is subject to the personal jurisdiction and venue of this Court.  A substantial part of the events giving rise to the claims asserted occurred in this District and the potential impact of the violations alleged will be a substantial lessening of competition in the relevant market in this District and an injury to Plaintiffs' business and property in this state and district.  Defendant will, if not enjoined, inflict substantial and irreparable damage to Plaintiff's business, revenues and profits arising from activities within this District.

## III.  THE PARTIES

4.      Plaintiff Prime Table Games, LLC ("Prime") is a limited liability company organized

and existing under the laws of the State of Nevada, having an office at 7251 West Lake Mead

Boulevard, Suite 300-123, Las Vegas, NV 89128.  Prime does business in this judicial district

and state.

5.      Plaintiff Prime Table Games UK ("UK") is a partnership organized and existing under

the laws of the United Kingdom which was formerly known as "D & H."

6.      Plaintiff Derek Webb ('Webb") is a citizen of the United Kingdom, who conducts

business in this judicial district and state.  Webb is the inventor of Three Card Poker, the most

popular proprietary table game in the world, as well as other such games, and is a 50% owner

of both Prime and UK.

7.      Plaintiff Hannah O'Donnell ("O'Donnell") is a citizen of the United Kingdom who

conducts business in this state and judicial district and is 50% owner of Prime and UK.

8.      Defendant Shuffle Master, Inc. ("Shuffle Master" or "Defendant") is a corporation of

the State of Minnesota, with offices at 10901 Valley View Road, Eden Prairie, Minneapolis,

Minnesota 55344 and 1106 Palm Airport Drive, Las Vegas, Nevada 89119.   It transacts

business and does business in this state and judicial district.  Upon information and belief,

Defendant has been registered as a foreign business corporation in Mississippi since 1994 and

has appointed an agent for service of process in Mississippi.  Defendant also has a branch in

Gulfport, Mississippi.

9.      According to Defendant's website, Shuffle Master is "the industry leader in [casino]

table games and related technology."

1357850

## IV.  BACKGROUND

10.     This action relates to the market for proprietary casino table games ("the relevant

product market") in the United States (the "relevant U.S. market") and  the worldwide market

for such games ("the relevant global market") (the U.S. and global markets are sometimes

collectively referred to as the "relevant markets") and Defendant's unlawful efforts to control

the products and prices in those markets through various anti-competitive activities alleged

herein, including, *inter alia,* its enforcement of and refusal to waive or release certain

anticompetitive contractual provisions with Plaintiffs, including a covenant not to compete and

a right of first refusal, its acquisition of most of its significant competitors and/or their

competing games, including its acquisition of the table games division of Progressive Gaming

International Corporation ("PGIC") on September 28, 2007 and through the other

anticompetitive conduct detailed below.

11.     In the mid 1990's, Plaintiff Webb, doing business as Prime Table Games, developed a

proprietary casino table game called "Three Card Poker." Webb applied for patent protection

on his game Three Card Poker and obtained United States Patent No. 5,685,774 on November

11, 1997.

12.     Three Card Poker was very successful commercially and by July, 1998, was being

played at over one hundred revenue-generating casino tables.

13.     Prior to Three Card Poker entering the proprietary casino table game market, a game

called Caribbean Stud, owned by Progressive Gaming, Inc. ("PGI") was the dominant

proprietary casino table game in the relevant U.S. market.  By 1993, another competing

1357850

proprietary table game called "Let It Ride" was commercialized by Defendant which also became a commercial success, second only to Caribbean Stud in the relevant markets.

14.   By 1997-98, Let It Ride, Caribbean Stud and Three Card Poker represented over 80% of the relevant U.S. market.  On information and belief, the share of the relevant U.S. market that is now controlled by Defendant, is even greater than 80%.

15.   On July 20, 1998, Mikohn Gaming Corporation, ("Mikohn"), which was concurrently negotiating to buy PGI, offered to buy Three Card Poker including the patent rights and the casino table leases for that game from Plaintiffs who rejected that offer.

16.   In the fall of 1998, Mikohn purchased PGI, and its proprietary game Caribbean Stud Poker and took over PGI's ongoing patent litigation against Defendant and others.  All lawsuits continued in PGI's name at Mikohn's direction.

17.   On December 28, 1998, PGI sued Webb, O'Donnell and Prime, alleging infringement of the Caribbean Stud patents.

18.   PGI had previously sued Defendant for infringement of the same and other Caribbean Stud patents.  In defense of PGI's suit against it, Defendant asserted that a game called "Casino Poker" was actually developed by Mr. David Sklansky and publicly played in the United States more than a year prior to the filing of any of the Caribbean Stud patent applications, thereby invalidating such patents.  Defendant further asserted that PGI, the alleged Caribbean Stud inventors, and its patent counsel misrepresented the prior art Sklansky game to the U.S. Patent Office despite their "continuing duty of candor" under applicable patent statutes, thereby rendering the Caribbean Stud patents unenforceable for "inequitable conduct" or "fraud on the Patent Office," as well as invalid over the prior art.

1357850

19.     At least as early as August 1998, Defendant had a copy of the prior art Sklansky Casino

Poker rules "rack card" which was used at a public "field trial" of that game well prior to the

filing of the asserted PGI patents.  That rack card showed that, contrary to PGI's

representations to the Patent Office, Sklansky's Casino Poker paid escalating bonuses based on

poker hand ranking, a key point with respect to the patentability of the Caribbean Stud patent

"family."  Defendant contacted David Sklansky after receiving the card from another source.

Defendant was in personal contact with Mr. Sklansky and/or his ex-wife, Robbie Giddens, no

later than August 1998.

22.     In October 1998, Defendant met with Webb and O'Donnell with regard to purchasing

Three Card Poker and the intellectual property associated therewith and eventually made an

offer to Plaintiffs on October 23, 1998.  That offer included, among other things, $2 million

cash, plus $750,000 in guaranteed payments over the first five years and continuing payments

based upon the success of Three Card Poker in the marketplace, i.e., 35% of gross table lease

revenues above a base amount, 10% of video game revenues and 80% of third party licensing

revenues.  During the parties' negotiations Defendant discussed the multiplicity of suits filed

by PGI against Shuffle Master in multiple venues around the United States and the high cost of

that litigation, which Defendant advised Plaintiffs already exceeded two million dollars.

Defendant did not, however, disclose the existence or its possession of the Casino Poker rack

card or its discussions with Mr. Sklansky or his ex-wife or the other information noted above

showing the invalidity and unenforceability of the PGI patents.

23.     On December 2, 1998, Defendant entered into a consulting agreement with Mr.

Sklansky in order to, obtain additional documents and testimony from Mr. Sklansky regarding

his Casino Poker prior art.  Defendant agreed to pay Mr. Sklansky a "consulting fee" of $7,000

per month, pursuant to which Mr. Sklansky met with Defendant to discuss the rules of

Sklansky's Casino Poker and Sklansky's prior involvement with the alleged inventors of

Caribbean Stud, Daniel A. "Danny" Jones and James P. Suttle.

24.     Also in December 1998, Defendant obtained from Sklansky's ex-wife, Robbie Giddens,

a copy of a magazine article entitled "Sklansky Invents New Casino Game" which was

published in the Las Vegas Sports Book on March 19, 1982 showing Sklansky's Casino Poker

bonus payout schedule at the Nevada Gaming Authority public field trial, together with a

sworn declaration from Ms. Giddens attesting to the authenticity of the SPORTS BOOK article

as well as the rack card and a photo in the March 4, 1992 edition in the Las Vegas Sun

showing Mr. Sklansky watching two famous poker players play his Casino Poker game that

same week  All of these events occurred more than a year prior to the filing of PGI's patents.

25.     By at least February 26, 1999, Defendant also had in its possession certain copyright

registration materials relating to Casino Poker prepared by a patent attorney named Ted Quirk

on Mr. Sklansky's behalf which explicitly showed that Sklansky's Casino Poker paid enhanced

payouts at stated odds dependant on the amount of the wager, a key point showing Caribbean

Stud to be unpatentable.  The actual copyright registration for Mr. Sklansky's Casino Poker

had previously disappeared from both the U.S. Copyright Office and later Patent Office filings.

26.     Through Sklansky's meetings with Defendant's current Chief Executive Officer, Mark

Yoseloff ("Yoseloff"), and by obtaining the above materials, Defendant knew; and, even more

importantly, knew it could prove, that prior art Casino Poker included payoffs of greater than

one-to-one odds and that the asserted Caribbean Stud patents were invalid and that the alleged

"inventors" of that game, its assignees and its patent attorneys, had knowingly misrepresented

this key point of patentability to the U.S. Patent Office, thereby rendering the Caribbean Stud patents unenforceable and invalid.

27.     By March 3, 1999, Defendant had the actual files of Mr. Quirk containing the copyright registration materials.  By April 1999 at the latest, Defendant had the July 14, 1993 Affidavit of David Sklansky, which was signed by Sklansky in front of one of the alleged Caribbean Stud "inventors," Danny Jones, and his patent attorney, Robert Purcell (who had prepared that affidavit), which also established the existence of Sklansky's bonus payments and even more importantly, Purcell's and Jones' knowledge thereof.

28.     From those materials, Defendant knew that Mr. Quirk, his law partner, Mr. Roethel, and Mr. Robert Purcell, each of whom had represented the Caribbean Stud patent "inventors" and owners, had intentionally misrepresented the rules of the Sklansky game to the U.S. Patent Office and had repeatedly filed false declarations and other knowingly false papers with the U.S. Patent Office in support of the patent applications at issue and knew that such misrepresentations would be considered "material" to a patent examiner.

29.     As result of this information, Defendant's patent litigation attorney, Mr. Cary Johnson, wrote a March 4, 1999 letter to the licensees for Defendant's proprietary game, Let It Ride (who had also been sued by PGI), advising them that the Caribbean Stud patents "may have been obtained by fraud" and that such patents "may be invalid."

30.     On April 28, 1999, in a telephonic hearing on a case entitled PGI v Bet Technology, Defendant's attorney, Mr. Johnson, advised the court that, based on information "we discovered just in the last few months that there is a game. . . called Sklansky's Casino Poker that was tested and field tested publicly" and that "there is a virtual certainty that . . . the '553 patent is dead, and . . .every single patent subsequently issued that is related in terms of the

- 8 -

1357850

substance of those claims, all of those patents likewise die." This information was not provided to or known by Plaintiffs. Indeed, Mr. Johnson represented to the Court in the April 28, 1999 telephone conference that "I'm the only guy with this knowledge sitting in my head." The significance of this knowledge is illustrated by Mr. Johnson's further statement to the Court in the PGI v Bet case that "as soon as the Casino Poker stuff came to light we've been having our door beaten down by [PGI] in terms of settling this case."

31.     In March 1999, Mikohn approached Plaintiffs a second time to purchase Three Card Poker and its related assets. Mikohn's second 1999 offer was only a fraction of what had been offered to Plaintiffs prior to the PGI suit against them.

32.     During this period Defendant was also in contact with Plaintiffs to purchase the rights to Three Card Poker, starting with an offer to purchase in the Fall of 1998, and followed by a second offer in the Spring of 1999. Although Defendant's 1999 offer was lower than both PGI/Mikohn's offer and Defendant's earlier offer in the Fall of 1998, it provided Plaintiffs what they perceived to be the only way of defending the Mikohn/PGI infringement lawsuit, which Plaintiffs could not then afford to (Defendants had already spent over $2 million) and avoiding the drain on Webb's and O'Donnell's time which was needed to keep their business alive. Being unaware of the powerful evidence in Defendant's possession proving the Mikohn/PGI patents to be invalid and unenforceable and having no other reasonable options apparent to them, Plaintiffs accepted Defendant's offer to purchase Three Card Poker even though the price represented only a fraction of the business's worth and the proffered contract contained the potentially onerous, potentially anticompetitive provisions at issue. The transaction was documented in a May 1, 1999 Purchase and License Agreement (the "May 1 Agreement" or simply "Agreement").

-9-

33.   At no time during the negotiation or consummation of Shuffle Master's purchase of
Three Card Poker did Defendant provide to Plaintiffs any indication that Defendant had
retained the services of Mr. Sklansky as set out *supra*, nor did Defendant provide any
indication to Plaintiffs of the existence or its possession of any of the following documents:  a)
the Sklansky Poker rack card; b) the March 19, 1992 Las Vegas Sports Book magazine article;
 c) the March 4, 1992 Las Vegas Sun photograph; d) the Giddens declaration;  e) the Casino
Poker copyright; f) the July 14, 1993 Sklansky affidavit; or g) the March 4, 1999 Cary Johnson
letter.  Under the circumstances, the existence of such evidence and Defendant's possession of
it were facts basic and material to the parties' transaction which Defendant had an obligation
to disclose to Plaintiffs, but concealed from them.

34.   Beginning in the fall of 1998 and continuing through May 1999, Defendant made
multiple material statements, representations and inquiries to Plaintiffs regarding Shuffle
Master's pending litigation with PGI on the Caribbean Stud patents, Mr. Sklansky, and a major
court decision that had gone against Shuffle Master that, under the circumstances, required the
disclosure of additional facts necessary to make the facts disclosed not misleading.  Having
made these statements and inquiries to Plaintiffs during the negotiation of Shuffle Master's
purchase of Three Card Poker, Defendant's failure to disclose and concealment of this critical
information and evidence rendered the statements and representations made by Defendant false
or misleading.

35.   Even after the completion of the purchase of Three Card Poker and Mr. Johnson's
assumption of  Plaintiffs' defense of the PGI litigation against Plaintiffs, neither Defendant nor
Mr. Johnson disclosed or provided any of these documents or information to Plaintiffs.

1357850

36.     As part of the May 1 Agreement Defendant insisted on including the covenant not to compete and right of first refusal described in Count I, *infra*. Just as Plaintiffs had no real choice with respect to price, they also had no real choice but to accept those terms. However, unlike the immediate impact of the lower price and different payment structure, Plaintiffs suffered no immediate harm from those contractual provisions as they had no pending or imminent plans, negotiations or agreements to sell any of the Retained Assets which were subject to the right of first refusal or to enter the U.S. market with any game covered by the non-compete clause. Nor did Plaintiffs have knowledge of any internet infringers of both parties' rights or the wherewithal to take any action against any such hypothetical infringers.

37.     In December 1999, PGI/Mikohn and Defendant entered into a settlement agreement which had the effect of protecting both the PGI patents and Defendant's market position by, among other things, insulating the relevant markets from competition by third parties via a "gag order" provision against disclosing information including the above-described evidence of PGI's patent fraud that was adverse to the settling parties' patent-protected duopoly in the relevant markets. This sham settlement agreement, which included circular payments from Defendant to PGI and back to Defendant, further enhanced Defendant's market power in the relevant markets via the settling parties' ability to keep other games from being played or becoming successful. This monopoly power, obtained by Defendant through the acquisition of Plaintiff's Three Card Poker and the sham settlement with PGI/Mikohn, allowed Defendant to significantly raise the price of Three Card Poker while maintaining and increasing its market share in the relevant markets.

38.     After the sham settlement was announced Plaintiffs contacted Mr. Johnson, Shuffle Master's attorney, to bring an action against PGI. Johnson declined, asserting a conflict of

- 11 -

interest with Shuffle Master.  As Plaintiffs later learned, that conflict arose from the above described "gag order."

39.     After accumulating the funds necessary to engage in protracted antitrust litigation, Plaintiffs filed suit in this court against Mikohn and PGI under the Sherman Act in December 2002 based upon PGI's "sham litigation" against Plaintiffs on the basis of patents obtained by fraud on the Patent Office at a time when PGI already had significant market power in a properly defined relevant market and a dangerous probability of achieving monopoly power in that relevant market, i.e., "proprietary casino table games in the United States."  That suit was styled Webb et al v. Mikohn Gaming Corporation, et al, Case no. 3:02-CV-1838-HTW-LRA, So. Dist. Miss., Jackson Div.

40.     Through discovery in that case, the above described facts and evidence, already known to Defendant, were uncovered by Plaintiffs and presented to the jury which found in favor of Plaintiffs on each of the above allegations and awarded $13 million in compensatory damages in February 2007.  That verdict, which was sustained on post-trial motions by Chief Judge Henry Wingate in the fall of 2007, compensated Plaintiffs only for their lost profits on Three Card Poker in the United States; it did nothing, nor could it, to relieve Plaintiffs from the effect of the non-compete, internet enforcement and first refusal clauses in the Agreement with Defendant.

41.     Plaintiffs became aware of internet infringement of the parties' respective intellectual property rights and brought this to the attention of Defendant per paragraph 16 of the Agreement.

42.     Effective policing of internet infringement of the parties' intellectual property rights requires joint action by the parties since such infringement crosses international boundaries

1357850

and frequently infringes both U.S. and U.K. intellectual property rights even if it originates or

terminates elsewhere.  Paragraph 16 of the Parties' May 1 Agreement provides:

"*If* Shuffle Master elects not to pursue a third Person infringer of [Plaintiffs'] Retained Assets to
*the extent* such infringement *also* infringes [Defendant's] Game Intellectual Property rights
transferred herein, Prime/Webb *shall have the right to pursue the infringement....*"

43.      Since Plaintiffs do not require any permission or grant from Defendant to pursue

infringers of Plaintiffs' Retained Assets utilizing only their own intellectual property rights, the

term "the infringement" can only refer to that which infringes both Plaintiffs' and Defendant's

rights  and the term "shall have the right to pursue the infringement" can only mean the right to

make use of the "Game Intellectual Property rights" transferred to Shuffle Master, together

with Plaintiffs' own "Retained Assets," to pursue such joint infringement "if Shuffle Master

elects not to pursue" it.

44.      In November, 2004 Plaintiff contacted Defendant's Chief Operating Officer, Paul

Meyer, with respect to implementing Paragraph 16 of the Agreement.  Mr. Meyer's response,

on November 18, 2004, was:

"*Too bad.*  Since we will not be able to come to an agreement regarding THREE CARD POKER
for Table Master in the UK, we will retain *all* of the internet gaming rights as described in the
sale agreement.  Jerry will respond to you separately regarding our opinion of Clause 16.

45.      Thereafter, Mr. Jerry Smith, Senior Vice President and General Counsel of Defendant

wrote to Plaintiff Webb by e-mail stating:

"My reading of Paragraph 16 means that you have the right to pursue infringers of *your* Retained
Assets in the British Isles *only*, *and* provided that the infringers are also infringing the rights
transferred to Shuffle Master under the agreement.  You now have no *right* to pursue any
infringers for any acts of infringement outside of the British Isles."

46.      Defendant's refusal to cooperate with Plaintiffs with respect to internet rights,

specifically those which involve infringement of both Plaintiffs' and Defendant's rights, is a

1357850

breach of Plaintiffs' contractual right to utilize both parties' intellectual property rights to pursue such infringers "[If] Shuffle Master elects not to pursue" such infringement, as provided by Paragraph 16 of the parties' May 1999 Agreement. Defendant's conduct has and will continue to cause substantial damage to Plaintiffs' business and property.

47.     Plaintiffs and Defendant had further contacts with respect to policing infringement by internet infringers, including a series of letters between February 6, 2005 and June, 2005 with respect to joint legal representation to pursue internet infringers.

48.     Subsequent face to face and written negotiations between Plaintiffs and Defendant in 2006 and 2007 with respect to policing internet infringers as well as with respect to the non-compete and first refusal provisions and other matters reached an impasse in late August, 2007 and no agreement was ever reached on a basis that was fair and equitable to Plaintiffs.

49.     While the above negotiations were pending, Defendant entered into an agreement with respect to internet gaming with an entity called DELTA Rangers, Inc. ("DELTA") on or about August 9, 2006, by which Defendant granted an exclusive license to DELTA to utilize Three Card Poker via an on-line internet gaming site to be located in Malta with all royalties paid to Defendant. Although that agreement required DELTA to prohibit residents of the United States (the only jurisdiction where Defendant has any patent rights) from playing or betting on the licensed site, it imposed no such requirement with respect to the British Isles (where Plaintiffs have exclusive rights to Three Card Poker). Shuffle Master had no right to grant an exclusive license to DELTA with respect to internet gaming controlled from, originating in, or terminating in the British Isles via gaming participation by a site owner, software provider, affiliate, resident or player in the British Isles since Plaintiffs have exclusive rights to such

1357850

"Retained Assets."  No portion of any royalties received by Defendant from DELTA has been shared with Plaintiffs.

50.     Implicitly recognizing that Defendant did not have the power to grant such rights to DELTA, Guardian Gaming Limited, a Malta International Trading Company and subsidiary of DELTA, approached Plaintiffs in mid-November 2007 offering to purchase Plaintiffs' Three Card Poker internet rights  for $3.5 million dollars from settlements obtained from internet infringers based on a formula that provided a percentage of any such settlement to Plaintiffs, to Defendant and to Guardian.  This arrangement was, however, dependant on Defendant's good faith in utilizing the "Game Intellectual Property" rights transferred to them via the May 1999 Agreement and, pursuant to paragraph 16 of the May 1 Agreement, in bringing the necessary litigation or to at least assert a credible threat of doing so against joint infringers of the parties' respective internet rights or allowing Prime to do so.  Defendant has done neither, nor have they fairly allocated any settlement proceeds from any such joint infringers.

51.     On May 7, 2007, Defendant entered into a license agreement with Playtech Ltd ("Playtech"), an Isle of Man corporation and designer of online and land-based software for the gaming industry, which had been infringing the parties' respective rights in and to Three Card Poker and still is infringing Plaintiffs' rights in that regard, to provide gaming software for a suite of proprietary games that includes Three Card Poker.

52.     Thereafter, on June 27, 2008, Playtech entered into an agreement with a Channel Island company, Genting Stanley Alderney Limited, a wholly-owned subsidiary of Genting International plc ("Genting Stanley") to enable internet gaming with respect to Three Card Poker from Genting Stanley's Channel Island website, CircusCasino.com, with respect to players in the U.K., the Isle of Man and the Channel Islands, all of which are within Plaintiffs'

1357850

"Retained Rights" and not within the intellectual property or contractual rights transferred to Defendant.

53.     On information and belief, the Shuffle Master/ Guardian/ Playtech agreement includes a license for Playtech to sublicense Three Card Poker on a world wide basis including the British Isles but not the United States, the only jurisdiction in which Shuffle Master actually has any patent rights to that game.

54.     Playtech's principal office is on the Isle of Man, which is part of the "British Isles" as defined in the May 1 Agreement.

55.     According to its Managing Director for online gaming, Genting Stanley is "the UK's number one casino operator" and the products delivered by Playtech will provide an experience that "mirrors our [Genting Stanley's] land-based offer." Genting Stanley's land-based offerings in the British Isles include Three Card Poker which is licensed to Genting Stanley by Plaintiffs, the rightful owner of all rights to Three Card Poker in the British Isles, including internet offerings to or from the British Isles.

56.     On information and belief, Defendant received, or has the expectation of receiving, a financial benefit, directly or indirectly, from its contractual arrangement with Playtech, which arrangement is causing and, will continue to cause, irreparable harm to Plaintiffs' business and business relationships including but not limited to Genting Stanley and Goldstreet International Limited ("Goldstreet"), another company engaged in internet licensing, both of which have business and contractual relationships with Plaintiffs with respect to Three Card Poker in the British Isles.

57.     On information and belief, Genting Stanley would be licensing internet rights to Three Card Poker from Plaintiffs, either directly or through Playtech, Goldstreet, or similar entity,

1357850

but for Defendant's licensing arrangement with Playtech and Defendant's failure to act in good faith with respect to Playtech's infringement of the parties' overlapping internet rights and Defendant's obligations under paragraphs 5 and 16 of the May 1 Agreement.

58.     On information and belief, Playtech, would be licensing Three Card Poker from Plaintiffs, either directly or through Plaintiffs' relationship with Goldstreet, for sublicense to other casino operators, but for Defendant's failure to act in good faith with respect to Playtech and Defendant's obligations under paragraphs 5 and 16 of the May 1 Agreement.

59.     On information and belief, other internet gaming entities would be licensing Three Card Poker from Plaintiffs, either directly or through Goldstreet or otherwise, but for Defendant's failure to act in good faith with respect to Playtech and Defendant's obligations under paragraphs 5 and 16 of the May 1 Agreement.

60.     Under the May 1, 1999 Agreement, Defendant was obligated to refrain from infringing Plaintiffs' "Retained Assets," including the exclusive right to license Three Card Poker, in the "British Isles" as those terms are defined in that Agreement.

61.     Defendant breached this obligation by: (1) introducing a three card "Pair Plus" type table game bet in land-based casinos in the British Isles; (2) by filing a European Community Trademark ("CTM") application for exclusive use of the trademark "Three Card Poker" in the European Community which includes Ireland and the United Kingdom where Plaintiffs have exclusive rights under the May 1 Agreement; and (3) by contracting with Guardian and Playtech to offer Three Card Poker on a worldwide basis except in the United States via gaming software and internet service providers and an internet website site and inducing Playtech's infringement of Plaintiffs' exclusive rights in the British Isles. The latter action is

- 17 -

not only a breach of the May 1 Agreement, but also an unlawful interference with Plaintiffs'

business relationship with Goldstreet and indirectly with Genting Stanley.

62.     Plaintiffs received an unsolicited contact from an intellectual property innovation and

advisory firm based in the UK named ICEBERG Associates which acquires patent portfolios

for its own use as well as for clients.  On November 28, 2006, Plaintiffs and ICEBERG entered

into a "Confidential Disclosure Agreement" so ICEBERG could study the products covered by

Plaintiffs' intellectual property including products identified as "Retained Assets" in the May

1999 Agreement.  That agreement with ICEBERG included a warranty that ICEBERG's client

"had the financial means to complete this transaction at thirty million dollars

($30,000,000.00)" and "is interested in considering such purchase at that price, subject to due

diligence considerations."

63.     This ICEBERG transaction was, however, derailed by Defendant's right of first refusal.

 On November 30, 2006 ICEBERG advised Plaintiffs that "the right of refusal with Shuffle

Master was bit of a surprise."  The negotiations with ICEBERG were thereafter terminated, at

least in part because of the first refusal right held by Defendant.  On information and belief, no

bona-fide purchaser of Plaintiffs' Retained Assets or other intellectual property would be

interested in negotiating a multi-million dollar purchase or license of all of even a portion of

Plaintiffs' "Retained Assets" knowing that Defendant has a perpetual right to summarily usurp

the benefit of any such transaction.  The perpetual existence of this clause and Defendant's

refusal to release or waive the same is causing, and will continue to cause irreparable harm to

Plaintiffs, including chilling and dissuading Plaintiffs from developing new games, and

promoting existing games competing with Defendant and from bringing new competition into

the market via acquisition of part or all of Plaintiffs' assets subject to the right of refusal.

1357850

64.    Defendant's intransigence and bad faith with respect to Plaintiffs' internet rights, the encumbrance of the first refusal clause, and the non-compete provision has resulted in substantial business opportunity losses with respect to Plaintiffs' ability to effect timely and adequate recovery of internet damages, to effect an outright sale of Plaintiffs' businesses, and to grow their business and introduce new products, all to the detriment of Plaintiffs as well as to the detriment of possible competition in the relevant markets.

65.    Anticipating judicially relief of the anti-competition provisions of the May 1 Agreement, Plaintiffs have recently developed a new proprietary casino card game called "Super 3 Poker" and have jointly developed another such game called "U-Pik 3 Poker" with Mr. Stanley Ko.  However, the non-compete provisions of the 1999 Agreement have to date prevented commercial sales and leases of the above games, to the detriment of not only Plaintiffs, but also the parties' customers (casinos), end-users the parties' products (casino customers) and competition between and among promoters, sellers, lessees and lessors of proprietary casino card games, in the relevant markets.

66.    Plaintiffs have filed applications with and obtained game approvals from the Mississippi Gaming Commission for their U-Pik 3 Poker and Super 3 Poker games in Mississippi casinos.  Despite these regulatory approvals, Plaintiffs have been stifled in their attempt to promote such games in competition with Defendant as a result of Defendant's refusal to waive, release or modify the coercive non-compete and first refusal provisions of the May 1 Agreement.

67.    Plaintiffs have also requested approval from the Mississippi Gaming Commission for a side bet called "Jokolor" which is intended to be played with Pai Gow Poker or Fortune Pai Gow Poker.  That request for approval was filed prior to the Super 3 Poker request which has

- 19 -

1357850

been granted.  Plaintiffs have also requested approval for that side bet in Nevada, but have

been advised by Nevada Gaming authorities that such application had been  being held up

because of alleged intellectual property issues.  Jokolor has already been approved as a side

bet to Pai Gow Poker in Mississippi and Nevada; however, virtually all Pai Gow Poker tables

have been converted to Fortune Pai Gow Poker, thus negating the value of the earlier approval.

On information and belief, Defendant has improperly and unlawfully interfered with the

regulatory process in Nevada and possibly Mississippi by filing sham allegations which are

responsible for the administrative delays with respect to Jokolor.  Such actions are also part of

Defendant's anticompetitive and monopolistic conduct.

68.      Defendant has alleged that it has patent rights in the "Fortune" side bet to "Pai Gow

Poker" (Pai Gow Poker itself is in the public domain).  However, many of Defendant's Fortune

Pai Gow tables have been sold, rather than licensed or leased, by Defendant to various casinos.

 Under the "first sale" doctrine, Defendant has no right to interfere with any casino's use of

sold Fortune Pai Gow Poker tables or with Plaintiffs' sale or lease of products intended to be

played with such sold tables once Defendant has parted with title to such tables and its alleged

intellectual property rights with respect to such tables.  Defendant's attempt to interfere with

casino use of such tables and/or the sale or lease of products intended to be used in connection

with such sold tables prevents full enjoyment of products it has sold and constitutes patent

misuse and an unlawful and anti-competitive practice.  On information and belief, Defendant

has also marked its Fortune Pai Gow Poker game/side bet with a patent number which is either

invalid or not inapplicable to that game/side bet, which is also patent misuse, an

anticompetitive practice under the antitrust laws and a deceptive trade practice under the

Lanham Act.

1357850

69.    On September 26, 2007, Defendant acquired (by purchase and exclusive royalty-free licenses) all of the proprietary casinos table games owned or controlled by its primary competitor in the relevant market, Progressive Gaming International Corporation ("PGIC") fka Mikohn Gaming Corporation (the defendant in Webb v. Mikohn), for a basic sum of $19 million plus other consideration, for a total price of approximately $30 million. By that acquisition, Defendant increased its installed proprietary casino table games by 621 tables, adding to its already dominant position in the relevant markets. One of the games acquired was Caribbean Stud, which, prior to the emergence of Three Card Poker, was the number one proprietary casino table game in the world. Defendant also added Texas Hold'em Bonus to its dominating table game portfolio which already included "leading brands such as Three Card Poker, Let It Ride, Four Card Poker and Fortune Pai Gow Poker." Defendant also acquired, by purchase and/or royalty-free exclusive license, PGIC's progressive jackpot technology and patent portfolio.

70.    As a result of this September 23, 2007 acquisition, the number two company and Defendant's only significant competitor in the relevant markets was eliminated from those markets. There are now over 8,000 specialty table games ("like Three and Four Card Poker®") in the market today, compared to less than 1,000 fifteen years ago. The PGI acquisition greatly increased Defendant's market share and pricing power, allowing it to selectively raise table lease prices to supra-competitive levels or to selectively lower such prices to predatory levels to eliminate any unwanted competition.

71.    The addition of PGIC's electronic progressive equipment to Defendant's existing and future tables also creates an additional barrier to entry to existing and potential competitors of

1357850

Defendant in the relevant market including Plaintiffs, as well as a barrier to removal of Defendant's table game products by casino customers.

72.     The effect of Defendant's acquisition of PGIC's table games and progressive jackpot technology has been and will be to substantially lessen competition and tend to create, enhance and maintain Defendant's monopoly position and market power in the relevant markets, all to the detriment of competition, including competition from Plaintiffs, who have been injured in their business and property as a result of this acquisition.

73.     Defendant's acquisition of PGIC's assets is the latest in a series of acquisitions by Defendant beginning with its acquisition of Three Card Poker from Plaintiffs and followed by multiple other acquisitions of leading proprietary casino table games including: Fortune Pai Gow Poker, Royal Match and Casino War from Bet Technology; Bet The Set from Magnum Gaming; patent rights allegedly associated with Four Card Poker from King's Gaming; and Pai Gow Poker Jackpot from Multi-Shift/Spur Gaming, which have greatly increased market concentration, greatly decreased competition and greatly enhanced Shuffle Master's market power.

74.     As part of its acquisition of PGIC's table game assets, Defendant also acquired, by purchase and/or royalty-free exclusive license, PGIC's patent portfolio, including the invalid patents deriving from the original and subsequent Caribbean Stud patents which have been proven to have been obtained  through deliberate fraud on the U.S. Patent Office in the Webb v. Mikohn litigation in this Court.  Despite its knowledge of the invalidity of these patents, Defendant continues to market, sell and lease products with invalid PGIC patent numbers. Such patent mis-marking is part of Defendant's attempt to monopolize and monopolization of the relevant markets as well as a violation of Section 43(a) of the Lanham Act by using words,

- 22 -

1357850

terms and symbols which misrepresent the nature, characteristics and qualities, i.e. patent

protected status, of Shuffle Master products, thereby discouraging and dissuading potential

competitors from marketing such products. Plaintiffs have been damaged by, and Defendants

have obtained substantial revenue and profits from, such mis-marking and mis-marked

products.

75.     On information and belief Defendant has marketed a number of other games using the

"patent pending" designation and/or patent numbers from patents that are invalid and/or do not

cover the game as played, to discourage and prevent competition, including from Plaintiffs, as

part of Defendant's monopolistic conduct. Plaintiffs have been damaged by and Defendant

has obtained substantial revenue and profits from such mis-marking and mis-marked products.

76.     Defendant has also introduced, promoted and sold and/or leased  games called Crazy 4

Poker and Ultimate Texas Hold'em, both of which infringe Plaintiffs' U.S. Patent No.

6,503,145 (the '145 patent). Despite notice of such infringement, Shuffle Master, continues to

infringe this '145 patent. Defendants usurpation of and infringement upon Plaintiff's

intellectual property rights is also consistent with, probative of, and in furtherance of its

monopolization and attempted monopolization of the relevant markets.

77.     Plaintiffs have been injured in their business and property by such infringement,

including lost revenues, lost profits and lost market share.

78.     Shuffle Master's actions in the above regards have been willful and deliberate.

## COUNT ONE – UNREASONABLE RESTRAINT OF TRADE IN VIOLATION OF SHERMAN ACT, § 1

79.     Plaintiffs repeat the allegations of the preceding paragraphs as if set forth fully herein.

1357850

80.     By concealing its knowledge of key facts from Plaintiffs' when it had an obligation to

disclose the same in order to make Defendant's previous affirmative representations to

Plaintiffs not misleading, and by thereby exacerbating and taking advantage of Plaintiffs'

actual or perceived economic duress, Defendant extracted from Plaintiffs the covenant not to

compete and the right of first refusal detailed herein as part of the May 1999 Agreement with

Plaintiffs, with the intent, and ultimately the effect, of restraining trade and eliminating

competition in the proprietary casino table games market (the "relevant product market") in the

United States (the "relevant U.S. market") and in the global market for such games (the

"relevant global market").

81.     Under the "Non-Competition" clause imposed on Plaintiffs by paragraph 11 of the May

Agreement with Defendant, Plaintiffs are not permitted to "sell or license a three card primary

wager poker game or a poker game utilizing the ante, bet and pairs plus betting structure of

[Three Card Poker] outside the British Isles." This prohibition far exceeds the claimed scope

of the patents and patent applications acquired by Defendant from Plaintiffs as well as the

scope of any other patent rights held by Defendant. Plaintiffs' enforcement of that non-

compete clause constitutes patent misuse and an unreasonable restraint of trade in and with the

United States and unlawfully allocates to Defendant the entire relevant U.S. and global (except

the British Isles) markets for such games as well as restraining interstate and international

trade between, with and/or into the United States in the relevant product markets.

82.     The May 1, 1999 Agreement also includes a "Right of First Refusal" in paragraph 8

thereof that requires Plaintiffs to provide Defendant a 30 day window within which Defendant

can usurp any proposed conveyance by Plaintiffs to "any third party" "for consideration" of

"any or all of [Webb/Prime's] rights to the Retained Assets" including "any patent application

- 24 -

1357850

made as an independent, original or additional continuation patents[sic] after the effective date

of this Agreement which are not variations of [Three Card Poker]," plus "all patents issued and

trademarks, service marks or copyrights registered arising out of or based upon any of the

foregoing," plus "all other Intellectual Property, in connection with any of the foregoing."

This draconian provision has no time limit or termination provision.

83.     This overly broad (in geographic, temporal, and product scope) anti-competitive

provision has already negatively impacted negotiations with potential purchasers of Plaintiffs'

Retained Assets.  Such impairment of Plaintiffs' rights continues to directly and adversely

affect interstate and international commerce in and with the relevant markets.

84.     This scope of the above non-compete and first refusal clauses extends well beyond the

legitimate scope of any of Defendant's U.S. patents or any other U.S. intellectual property

purchased from Plaintiffs by Defendant and is an anti-competitive misuse of the acquired U.S.

patents, U.S. patent applications and U.S. intellectual property rights.

85.     Defendant's misuse of its purchased patent rights renders those purchased rights

unenforceable under U.S. patent law and unavailable as a defense to the asserted violations of

U.S. antitrust law.

86.     Defendant's enforcement of these provisions, and in particular the covenant not to

compete, also violates the common law of this State because it is overly broad geographically,

temporally and in product scope, and its enforcement by Defendant unreasonably restrains

trade in the relevant product market in this State (the "relevant Mississippi market").

87.     By reason of Defendant's enforcement of these contractual provisions and Defendant's

conduct with respect to the same, Plaintiffs and other actual and potential competitors and the

consuming public have been and will be deprived of the opportunity for meaningful

- 25 -

competition within all the relevant markets and in international commerce involving the United States. Defendant's acquisition of virtually all other significant competitors and/or virtually all other commercially significant competitive games has further deprived the consuming public of the benefit of actual and potential competition thereby exacerbating the anti-competitive impact of the contractual restraints at issue.

88.     Defendant's enforcement of the covenant not to compete and the first right of refusal, both singly and in conjunction with each other and defendant's acquisitions, constitute per se violations of Section 1 of the Sherman Act and, in conjunction with the other conduct alleged herein, constitutes unreasonable restraints on interstate and international commerce under the "rule of reason" since the enforcement of these provisions by Defendant operates as an unlawful allocation of the relevant markets to Defendant and because any legitimate benefit conferred on Defendant as result of these clauses and the challenged conduct is far outweighed by the anti-competitive harm to competition and the consuming public in the relevant markets.

89.     Plaintiffs have been and will continue to be injured in their business and property as a result of Defendant's unlawful actions and are entitled, under Section 1 of the Sherman Act (15 U.S.C. §1) and Section 16 of the Clayton Act (15 U.S.C. §26), to injunctive relief prohibiting the unlawful enforcement of the above clauses and the continuation of Defendant's illegal conduct.

90.     Plaintiffs are also entitled to compensation for the damages to their business and property, trebled, and their costs of prosecuting this action, including their reasonable attorneys' fees.

- 26 -

1357850

## COUNT TWO – MONOPOLIZATION OF THE RELEVANT
## MARKETS IN VIOLATION OF THE SHERMAN ACT, § 2

91.     Plaintiffs repeat the allegations of the preceding paragraphs as if fully set forth herein.

92.     Prior to acquiring Three Card Poker, Defendant already had significant market share and market power in the relevant markets.  By acquiring Three Card Poker, Defendant's market share and market power in each of the relevant markets were enhanced.  The non-competition and right of first refusal clauses of the May 1 Agreement further enhanced, maintained and entrenched Defendant's market power, including the power to raise prices while increasing market share, and to restrain and preclude competition from Plaintiffs and from other competitors and potential entrants in the relevant markets.

93.     Subsequent to the May 1 Agreement with Plaintiffs, Defendant entered into the PGI settlement agreement with the purpose and effect of further entrenching Defendant's dominant market position and of keeping out third party competition by making use of PGI's fraudulently acquired patents and PGI's willingness to engage in sham litigation based on those patents, and by agreeing to cooperate in concealing the evidence of PGI's patent fraud and sham litigation.

94.     Defendant's subsequent acquisition of virtually all commercially significant competing proprietary games and their accompanying intellectual property, including its recent acquisition of PGIC's table game assets, has further reduced competition and enhanced Defendant's monopoly power in the relevant markets.  According to Defendant's 2007 Annual Report, it has "the strongest portfolio of table game brands in the world" and now has "over 5,400 table games installed worldwide, 4,000 of which are on lease."  As shown by these numbers, Defendant controls over half of the proprietary card gaming tables in the world.

1357850

From 2005 to 2008, Defendant's worldwide revenue jumped from $112.8 million to $178.8 million, of which $33.1 million was attributable to its "Proprietary Table Games product segment."  Defendant currently has the leading worldwide market position in proprietary table games with all of the top six most popular game titles and eleven of the top fifteen most popular game titles in the world.  In addition to physical tables, Defendant's games are also played on the internet.  Defendant's "Shuffle Master Live" internet gaming website was launched in November, 2007.

95.     Defendant's ongoing refusal to release or modify its non-compete and first refusal agreements with Plaintiffs (the latter being construed by Defendant to provide Defendant with a perpetual option on all of Plaintiffs' games in the U.S. and U.K. not previously conveyed to Defendant) has further stifled and continues to stifle competition in the relevant markets from both Plaintiffs and other competitors or potential competitors, including potential competitors who have offered and/or who may offer to purchase and develop all or part of Plaintiff's gaming assets.  The continued existence, enforcement and potential enforcement of such contractual agreements assists Defendant in maintaining and expanding Defendant's monopoly of the relevant markets.

96.     By engaging in all of the above-described predatory acts, Defendant has willfully acquired, maintained and enhanced its monopoly power in the relevant markets.

97.     By reason of these continuing violations, Plaintiffs have been and will continue to be injured in their business and property.  Plaintiffs are entitled to treble damages and to injunctive relief under Section 2 of the Sherman Act and Section 16 of the Clayton Act (15 U.S.C. §§ 2 and 26) to prevent and restrain further predatory conduct by Defendant and the expansion or continuation of Defendant's monopolization of the relevant markets by, *inter*

1357850

*alia*, striking, limiting and/or modifying the non-compete and first refusal clauses and enjoining its enforcement.

98.     Plaintiffs' are also entitled to their damages, trebled, and the costs of prosecuting this action, including their reasonable attorneys' fees.

## COUNT THREE – ATTEMPTED MONOPOLIZATION IN VIOLATION OF SHERMAN ACT, § 2

99.     Plaintiffs repeat the allegations of the preceding paragraphs as if set forth fully herein.

100.     With the specific intent to obtain monopoly power, Defendant engaged in the exclusionary, unfair, and anticompetitive acts described above, with a dangerous probability of success that Defendant would, as it in fact did, obtain and illegally maintain monopoly power in the relevant markets.

101.     Such conduct in attempting and continuing to attempt to monopolize the relevant markets constitutes a violation of Section 2 of the Sherman Act (15 U.S.C. § 2).

102.     By reason of these violations, Plaintiffs have been and will continue to be injured in their business and property and are entitled to treble damages and to injunctive relief under Section 2 of the Sherman Act and Section 16 of the Clayton Act (15 U.S.C. §§ 2 and 26) to compensate Plaintiffs for their damages to date and prevent Defendant's continued predatory acts in furtherance of its attempt to monopolize the relevant markets by, *inter alia*, striking, limiting and/or modifying the non-compete and first refusal clauses and enjoining their enforcement.

103.     Plaintiffs are also entitled to recover their damages, trebled, and their costs of prosecuting this suit, including their reasonable attorneys' fees.

1357850

## COUNT FOUR – VIOLATION OF SECTION 7 OF THE CLAYTON ACT

104.    Plaintiffs re-allege the allegations of the preceding paragraphs.

105.    Shuffle Master's multiple acquisitions of the leading proprietary casino table games in the relevant market including those set out in paragraph 73 *supra* and, most recently, Caribbean Stud and the remainder of PGIC's proprietary table game portfolio and its progressive jackpot technology and assets will increase concentration, decrease competition and tend to create a monopoly in the relevant markets, as described in detail above.  As a result of such acquisitions Shuffle Master now owns and controls virtually all of the top proprietary games in the relevant market and has the market power to raise prices to supra-competitive levels and to exclude such competition and potential competition as may still exist.  Upon information and belief, Shuffle Master now controls at least 75% and possibly as much as 90% of the relevant U.S. market as a result of this series of acquisitions

106.    Such increased concentration, decreased competition and monopolization have injured and will continue to injure Plaintiffs in their business and property including, *inter  alia*, Plaintiffs' reduced ability to enter into joint ventures, license agreements and such other transactions with the eliminated entities, which transactions and arrangements would benefit competition, product diversity and consumer choice in the relevant markets as more particularly described above.

107.    Plaintiffs are entitled to their actual damages, trebled, plus such equitable, declaratory and injunctive relief as the court deems appropriate to the circumstances, in addition to their costs, including their reasonable attorneys fees.

1357850

## COUNT FIVE – BREACH OF CONTRACT, FAILURE OF CONSIDERATION, QUASI-ESTOPPEL AND UNCLEAN HANDS

108.   Plaintiffs repeat the allegations of the preceding paragraphs as though fully set forth.

109.   Under the May 1, 1999 Agreement, Shuffle Master was obligated to refrain from infringing Plaintiff's "Retained Assets" in the "British Isles" as those terms are defined in that Agreement.  Defendant breached this obligation by: (1) introducing a three card "Pairs Plus" type table game bet in casinos in the British Isles;  (2) by filing a European Community Trademark ("CTM") application for exclusive use of the trademark "Three Card Poker" in the European Community, including Ireland and the United Kingdom; and (3) by contracting, directly or indirectly, with Genting Stanley, dba CircusCasino.com, to offer Three Card Poker to residents of the British Isles via a site located in the British Isles.  The latter action is a breach of the May 1 Agreement as well as an infringement of Plaintiffs' intellectual property rights and an unlawful interference with Plaintiffs' pre-existing business arrangements with Genting-Stanley.

110.   Defendant has also breached its obligations under the May 1 Agreement with respect to the parties' joint policing of internet infringers as a result of Defendant's refusal to either utilize the intellectual rights conveyed under the May 1 Agreement or to permit Plaintiffs to use such rights against infringers of the parties' overlapping internet rights in order to permit Plaintiffs to effectively enforce Plaintiff's Retained Rights, all as provided in paragraph 16 of the parties' Agreement.

111.   The above breaches are material breaches of the parties' May 1 Agreement, excusing further performance of future obligations by Plaintiffs, including any obligations under the non-compete and first refusal clauses of that Agreement.

1357850

112.    Plaintiffs' Retained Rights in the British Isles and via internet infringers are the counterpart to Defendant's rights under the non-compete and first refusal clauses at issue are a material component of the consideration to Plaintiffs under the May 1 Agreement.  Because Defendant has breached its reciprocal obligations in the British Isles and with respect to the enforcement of Plaintiffs' internet rights, thereby depriving Plaintiffs of an essential component of the bargained for consideration, it would be unfair and unconscionable to permit Defendant to utilize the courts to enforce the clauses at issue.

113.    Defendant is estopped from seeking the aid of this court or any other court to enforce the clauses at issue under the equitable doctrines of "unclean hands" and quasi-estoppel and the legal doctrines of material breach and failure of consideration.  Plaintiffs are further entitled to partial rescission and/or reformation of such contractual provisions under the equitable powers of this Court.

114.    Plaintiffs seek an order of this Court: (a) that Defendant is precluded by the equitable doctrines of unclean hands and quasi-estoppel and the legal doctrines of failure of consideration and material breach from enforcing the covenant not to compete and right of first refusal provisions at issue against Plaintiffs, (b) enjoining Defendant from enforcement of such clauses, and (c) reforming the parties' contract to eliminate those clauses from the parties' May 1, 1999 Agreement.

115.    Plaintiffs are further entitled to declaratory and injunctive relief requiring Defendant to honor its obligations under paragraph 16 of the May 1 Agreement by either taking such steps as may be necessary to effectively police internet infringement of the parties' overlapping intellectual property rights based on the Game Intellectual Property rights transferred under the May 1, Agreement or, alternatively, permitting Plaintiffs to utilize the U.S. patents and other

- 32 -

1357850

intellectual property rights conveyed to Defendant under that Agreement so that Plaintiffs can effectively police internet infringement of their Retained Assets as expressly permitted by Paragraph 16 of the May 1 Agreement.

### COUNT SIX – BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING UNDER RESTATEMENT OF TORTS § 551 AND MISSISSIPPI COMMON LAW

116.    Plaintiffs reallege the allegations of the preceding paragraphs as though fully set forth herein.

117.    As set forth above, Defendant knew, but Plaintiffs did not, that the Caribbean Stud patent rights asserted by PGI against both Plaintiffs and Defendant were invalid and unenforceable and that Defendant had the evidence to establish those facts in court.  Defendant also knew that Plaintiffs were unaware of the fact, strength and extent of that evidence known to and in the possession of Defendant.  Defendant further knew that the presumed absence of and/or difficulty and expense of locating and proving such evidence were facts basic to the transaction and an essential basis of the bargain between  Plaintiffs and Defendant.

118.    Defendant further knew that its statements and representations with respect to the PGI v. Shuffle Master and PGI v. Webb lawsuits were false or misleading when made and became more so as Defendant obtained additional evidence of the invalidity and unenforceability of the Caribbean Stud patents.  Having made such statements, Defendant was obliged to correct such statements knowing they were material and basic to the parties' transaction.  Defendant's non-disclosure of such information under circumstances that made such non-disclosure misleading was wrongful.

- 33 -

1357850

119.    Defendant breached its obligations of good faith and fair dealing and its duty to disclose facts that were basic to the transaction under Restatement (Second) of Torts § 551(2)(e) and/or other applicable law.

120.    As a result of those breaches of duty and good faith, Plaintiffs are entitled to partial rescission and/or reformation and other equitable relief with respect to their continued obligations under the May 1 Agreement and in particular any continuing obligation under the non-compete and first refusal clauses at issue herein.

## COUNT SEVEN – PATENT INFRINGEMENT

121.    Plaintiffs re-allege the allegations of the preceding paragraphs.

122.    Plaintiff Webb is the inventor and Prime is the owner of the '145 patent.

123.    Defendant has infringed and induced others to infringe one or more claims of the '145 patent by its sales, use, offers for sale and promotion of both Crazy 4 Poker and Ultimate Texas Hold'Em .

124.    Plaintiffs have been injured, and will continue to be injured by such infringement unless it is enjoined by this Court.  Plaintiffs are entitled to actual damages, or at a minimum a reasonable royalty, trebled or otherwise enhanced due to the exceptional nature of this case and Defendant's willful infringement.  Plaintiffs are also entitled to recover their reasonable attorneys fees and costs.

## COUNT EIGHT – PATENT MISUSE

125.    Plaintiffs re-allege the allegations of the preceding paragraphs as though fully set forth herein.

- 34 -

1357850

126.   Defendant has misused the patent rights and patent applications acquired from Plaintiffs, including continuations, continuations-in-part, and divisionals of such applications, by using the covenant not to compete in the May 1, 1999 Agreement to unlawfully expand the scope of the claims of such patents and applications beyond what has been or could lawfully be granted by the U.S. Patent Office for the purpose and with the effect of substantially lessening competition and attempting to create, and creating, a restraint of trade and monopoly in the relevant markets as detailed above.

127.   Defendant has further misused the patents and applications conveyed by the May 1 Agreement to extend their geographic scope to the entire world (except the British Isles) and the temporal scope of the non-compete clause in the May 1 Agreement to an indefinite, unreasonable and unlawfully long period of time, all for the purpose and with the effect of substantially lessening competition and attempting to create, and creating, a restraint of trade and monopoly in the relevant markets as detailed above.

128.   Defendant's misuse of the acquired patents and patent applications as described above renders them, as well as the portions of the May 1, 1999 Agreement with prospective application, including the non-compete and first refusal provisions thereof, completely unenforceable by Defendant.

129.   Defendant has also misused the Caribbean Stud patent rights acquired from PGIC by: (1) using such patents, which were known to be invalid and unenforceable, to intimidate and coerce Plaintiffs into acquiescing to the non-compete and first refusal provisions of the May 1 Agreement; and (2) by placing the patent numbers of such patents on products sold or leased by Defendant, knowing that such patent rights were procured by a deliberate and intentional fraud on the U.S. Patent Office, as found by this Court in Webb v. Mikohn, et al, which

1357850

findings were known to and binding on Defendant, both as successors in interest with respect to such patents and under the principles of *Blonder-Tongue* estoppel, all for the purpose of misleading customers and competitors with respect to the scope and validity of such patents and the patented or unpatented nature of the products to which such markings are attached or relate, thereby inhibiting and restraining competition in the relevant markets.

130.    Defendant has also misused other patents owned by them by falsely marking various products, including but not limited to Royal Match, Bet The Set, and Fortune Pai Gow Poker, with the numbers of patents which are either inapplicable to such products, are invalid, or by falsely mis-marking its products with "patent pending," thereby misrepresenting that such games are or will be protected by patent when they are not and will not be so protected from competition.  Plaintiffs and competition in the relevant markets have been damaged by such actions.

131.    The misuse by Defendant and by Defendant's predecessors in interest with respect to the Caribbean Stud patent rights acquired by Defendant from PGIC and other patents held by Defendant renders those patent rights unenforceable by Defendant.  Defendant's false patent marking also subjects it to statutory fines under 35 U.S.C. Section 292, fifty percent of which are payable to Plaintiffs.

## COUNT NINE – UNFAIR AND DECEPTIVE TRADE PRACTICES
## VIOLATION OF LANHAM ACT

132.    Plaintiffs re-allege the allegations of the preceding paragraphs.

133.    Defendant's placement of patent numbers or the phrase "patent pending" on products sold or leased by Defendant, knowing that the patent rights associated with such patent

1357850

numbers and/or "patent pending" designation are inapplicable to such products, as in the case of Royal Match, Bet The Set, and Fortune Pai Gow Poker, and/or that such patent rights are invalid or unenforceable as a result of having been procured by a deliberate and intentional fraud on the U.S. Patent Office as found by this Court in *Webb v. Mikohn*, et al, with respect to Defendant's Caribbean Stud patents, which findings are known to and binding on Defendant, both as successors in interest with respect to the ownership of such patents and under the principles of *Blonder-Tongue* estoppel, constitute false and misleading representations of fact in connection with the advertising, promotion and/or sale or leasing of goods or services in violation of Section 43(a) of the Lanham Act, 15 U.S.C., Section 1025(a).

134.    Such conduct is also an unfair and deceptive trade practice under the laws of this State.

135.    Plaintiffs have been damaged in their business and property by the above violations of state and federal laws and will continue to be damaged unless such unfair and deceptive practices are enjoined by this Court.

136.    Plaintiffs are entitled to their actual damages, trebled, and/or a disgorgement of all of Defendant's profits from such unlawful activities as well as injunctive relief against further unfair and deceptive practices, plus Plaintiffs' reasonable attorneys fees and costs.

## RELIEF SOUGHT

WHEREFORE, Plaintiffs pray for a judgment:

A.    That the aforesaid acts by Defendant constitute an unreasonable restraint of trade in violation of Section 1 of the Sherman Antitrust Act, acts of monopolization and attempts to monopolize in violation of Section 2 of the Sherman Antitrust Act and an unlawful acquisition in

1357850

violation of Section 7 of the Clayton Act, each of which violations have injured Plaintiff and competition in the relevant market.

B.    That Defendant has infringed and/or induced infringement of the '145 patent and that Plaintiffs have been, and will continue to be, damaged by such infringement.

C.    That Defendant has violated Section 43(a) of the Lanham Act by placing false and misleading patent numbers on its products.

D.    That Defendant materially breached its obligations under the May 1, 1999 Agreement and that said breaches excuse future performance by Plaintiffs including, *inter alia*, under the non-compete and first refusal clauses of the Agreement and that Defendant is estopped from further enforcement of the same.

E.    That the non-compete and first refusal clauses imposed by Defendant in the May 1 Agreement have the effect of substantially reducing competition in the above-defined relevant markets; are unreasonable and unconscionable under the circumstances of this case; were imposed on Plaintiffs under circumstances of economic duress; and that Defendant is estopped from enforcing such provisions by its unclean hands, breach of contract, breach of the duty of good faith and fair dealing, and failure to disclose facts basic and material to the transaction which, under the circumstances, it was under a duty to disclose; and that Plaintiffs are entitled to rescission or reformation of such provisions.

F.    That Plaintiffs have been damaged in their business and property in an amount of not less than $15,000,000.00 in compensatory damages and will continue to be irreparably damaged in their property and business by the aforesaid anticompetitive and unconscionable conduct, breach of agreement, patent infringement  and violations of statutory and common law unless enjoined by this Court.

- 38 -

1357850

G.      Awarding Plaintiffs such compensatory damages, enhanced as provided below, plus such injunctive and other relief as may be just and equitable, including rescission or reformation of the non-compete and first refusal provisions of the May 1, 1999 Agreement, and enjoining Defendant from enforcing the same now or in the future.

H.      Awarding Plaintiffs their anti-trust damages, trebled, during the four years preceding the filing of this case, their patent damages, trebled or otherwise enhanced, during the six years preceding the filing of this case and their other damages during such other time periods as are appropriate under the facts and the law, including, where appropriate, punitive damages, plus their costs, including attorneys' fees, in prosecuting this action.

I.      Declaring that the non-compete and first refusal clauses of the May 1 1999 Agreement, each of the patents and patent applications acquired by Defendant from Plaintiffs, and each of the Caribbean Stud patents and patent applications acquired or licensed by Defendant from PGIC are unenforceable by Defendant as a result of Defendant's misuse and, in the case of the Caribbean Stud patents, Defendant's predecessors' misuse, of such patents and applications and enjoining any further enforcement of such patents and contractual provisions by Defendant.

J.      Declaring that Defendant's conduct as set out above constitutes unfair and deceptive trade practices and violations of the Lanham Act and the laws of Mississippi and awarding Plaintiffs their actual damages as a result of such deceptive trade practices, trebled, and/or an award of Defendant's profits from the sale of mis-marked and misrepresented products and services, plus attorneys fees and costs and enjoining any continuation of such unfair and deceptive trade practices.

K.      Awarding such other and further relief as the Court deems just and equitable under the circumstances of this case.

1357850

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial on all issues triable by a jury in this action.


Dated:  August 25, 2008                    Respectfully submitted,

                                           _David W. Clark_ (signature)
                                           _____
                                           David W. Clark
                                           BRADLEY ARANT ROSE & WHITE LLP
                                           One Jackson Place
                                           188 East Capitol Street, Suite 450
                                           Jackson Mississippi 39201
                                           Tel: 601 948-8000
                                           Fax: 601 948-3000
                                           Attorneys for Plaintiffs PRIME TABLE GAMES
                                           LLC, Prime Table Games UK, Derek Webb,
                                           and Hannah O'Donnell

_Of Counsel:_

Robert A. Rowan
Joseph S. Presta
Michael E. Crawford
NIXON & VANDERHYE P.C.
901 N. Glebe Rd., Suite 1100
Arlington, Virginia 22203
Tel.: 703-816-4000
Fax: 703-816-4100

1357850